understand it both sides have waived their uninterrupted time and so with that we'll call first Mr. Shadowin. Good morning your honors may I please the court Steve Shadowin on behalf of the plaintiffs. Your honors these plaintiffs have done the responsible practical thing. They have sought review in the United States courts under United States law of the conduct of a United States Border Patrol agent in the course and scope of his employment for the United States of his conduct that occurred wholly on US soil. So they brought their case in the United States courts. In an extraordinary claim of executive prerogative the government asserts that there can be no judicial review. That is that the executive has the absolute unreviewable unilateral power to take wholly innocent civilian human life. An extraordinary claim of executive prerogative. Our view is and we do not have that power that it claims. There is no legal black hole on the border. There is no lawless border area. This conduct of a fundamental human right to life must be reviewed by the US courts. This court has the tools to says that there is a practical functional test for the occasions on which the Constitution has extraterritorial effect. If ever there was a case that calls out for a practical functional extension of judicial review of executive US conduct this is that case. Let me ask you Mr. Shadowin. Are you saying this is extraterritorial conduct or it's not extraterritorial conduct. We believe it's not in the first instance your honor in that every extraterritorial. That's correct. If if there if extraterritoriality is not required here then clearly we have a Bivens cause of action. It's an ordinary Bivens case and we believe that there is no case that has ever occurred where a court has said required extraterritorial effect of the Constitution were all of the conduct occurred on US soil. You dropped your Federal Tort Claims Act case did you not? We did your honor. And I assume that was because of the foreign country exception. That's right. And the foreign country exception says if the place of the where the act occurred is on foreign soil 2680 K then the government can't be liable. Is that correct? Cannot be liable under the Federal Tort Claims Act. That's right your honor. Sosa case didn't I believe it's Sosa. Didn't Justice Ginsburg say that means in traditional terms the place where the injury occurred? I'm trying to recall Justice Ginsburg's. In that case Sosa had two aspects to it. One was the application of the Alien Tort Statute. The headquarters doctrine was relevant to the FPCA and the foreign country exception and Justice Ginsburg specifically concurred on the basis that the foreign that the Federal Tort Claims Act was the prevailing rule. The law the common law has moved away from that choice of law principle but that was in fact the holding there is that the the foreign country exception applied under the Federal Tort Claims Act. Of course. I'm trying to narrow the case a bit by asking you then since that was the case and you have dropped your Federal Tort Claims Claim based on that exception then that must mean that it's an extraterritorial case. I don't I don't see the connection there with respect your honor because they're simply a statutory scheme there in which the Supreme Court and Sosa construed that particular statutory exception to say it's a Lex Loci where the injury occurred. That's what governs under that statute. So what gives the federal court the right to make up a new international choice of law for purposes of this? It's not making up a new international choice of law your honor but as as the court is aware there's an exception in the Federal Tort Claims Act for Bivens actions. That is the Bivens actions is subject neither to the general provisions of the Federal Tort Claims Act nor to the exceptions such as the foreign country exceptions. And Bemidine provides the governing rule for whether or not the Constitution not the statute the Federal Tort Claims Act but the Constitutions and the Bivens claim directly under the Constitution can be brought. It's Bemidine that that provides the rule of decision there. Yes yes your honor. Okay now that's if extraterritoriality is required we say it's not required because all of the conduct occurred in the United States and there is no there is no decision that has ever said extraterritoriality is required when all of the conduct occurs in the United States. But that's not our principal point. We think that that's the right rule. Primarily we rely upon Bemidine and the extraterritoriality effect that it gives under these circumstances. With respect to Bemidine the government says that it's limited to the habeas corpus clause that is the suspension clause. That's not true. Any fair reading of Bemidine makes clear two points. Number one the Supreme Court reviewed all of its prior extraterritoriality decisions including those under the fourth and fifth amendments and distilled from that all of that prior case law a rule. It says all of those cases have applied in effect a practical and functional approach to extraterritoriality. The Supreme Court goes through in detail and says that's how we decide extraterritorial effect for all of the Constitution. And it uses that language. It says the extraterritorial effect of the Constitution not just of the suspension clause. So the court sets out distills from its prior case law a general rule of decision and then applies that rule to the suspension clause which was the specific provision of the Constitution that was at issue in that case. And so the notion that it's only the suspension clause that gets extraterritorial effect or that is subject to Bemidine is simply not true. So the language of Bemidine and more importantly the court's analysis how it went about getting to where it got makes clear that all the provisions of the Constitution are subject to this rule of extraterritoriality. Did the court overrule Verdugo? The court did not need to overrule Verdugo because that was a plurality decision. But Justice Kennedy said he joined the opinion of the court. He said he joined the opinion of the court with his caveat that he got there a different way. He said I believe we do not fundamentally differ. I do not fundamentally differ with the court and I joined the opinion. And he got there an entirely different way. He specifically and emphatically rejected the plurality's reliance upon the people language of the Fourth Amendment. Did Bemidine overrule Johnson v. Eisenhager which emphatically Justice Jackson emphatically stated that the Fifth Amendment does not apply to aliens abroad? It did not overrule it but he said that the government's reading of it in those stark terms they emphatically rejected. H.R.A. sovereignty is not required and they did reinterpret it. I'll concede that. But what authority do we have to say that Bemidine sub salentio overruled Johnson? There's no need to come to that conclusion. The court simply said that the government had been misreading Johnson v. Eisenhager. I believe the specific language is that Eisenhager never said that de jure sovereignty was or ever has been the only factor for extraterritoriality. And the government is trying to resurrect that sort of formalist view and that's the language that Bemidine uses. It says that the government and they're doing it again here today is trying to resurrect a formalist approach. That is citizenship or non-citizenship is the end all and be all and de jure sovereignty is the end all and be all. And this court specifically repeatedly emphatically rejected that and says that's not the approach. The approach is practical and functional where yes, obviously it's important that is there de jure sovereignty or de facto sovereignty? Yes, it's important. Is the person a U.S. citizen or not? But those are simply one among many factors and that's the difference. And the Supreme Court in Bemidine was very, very emphatic and clear that this is not a new rule of decision, that this is the proper reading of the Supreme Court cases from Eisenhager to the present. When you say affirming would create a world of impunity and non-court reviewability of federal executive action, wouldn't the federal executive action here still be reviewable by various levels of courts? If the Mexicans chose to indict and then prosecuted in absentia and sought extradition, those courts would be reviewing it. The error may be with the extradition process. The Texas courts could review federal executive action. In other words, they could seek prosecution if there were a case. Federal courts could review the government's certification of scope of employment. So it seems to me there are layers of court review that still exist. It may not be federal court review. But even as to that, that's largely because of SOSA, which is a decision from less than 10 years ago. So you would think that you could end up with a law enforcement proviso exception to the foreign country exception. Congress could go ahead and do that and reinvest federal courts with authority. So my larger point is it would seem to me three existing levels and maybe a fourth easily obtainable level, in light of the change that SOSA effected, would give you court review. These are not issues that have been, frankly, that I've thought of or have been briefed. But while the brief has constantly said the issue here is unilateral federal executive authority, that there will be no judicial review of, and yet there are layers of judicial review that exist. Well, let's take, for example, a state court prosecution. That, again, would put the decision in the hands of a state prosecutor, the executive branch. The extradition to Mexico, that has been sought and has been refused by the U.S. executive, again, with the decision in the hands of the executive rather than the judicial branch. So the traditional method for obtaining review of exactly this kind of conduct. If this conduct, if Sergio had been standing, you know, 30 yards to the west or the east or the north, rather than 30 yards to the south, this would be an ordinary Bivens case. Not that they're not important, but they happen every day. Why didn't you seek review of the government's decision to certify that he was acting within the scope of his employment? I don't know the answer to that. I was not involved at the district. My last question is, you had referred earlier to our Sutton decision, and the government filed the 28J to Castro relating to the law enforcement proviso being sort of a trump of the various exceptions. Can you elaborate on that argument here? Is that part of your argument to us today, that in fact, even if the foreign country exception exists, the law enforcement proviso is a comprehensive exception to that exception? Are you asserting that argument? We have not asserted that in this in-bank review. Okay. With respect to, I'd like to address briefly whether or not the law was clearly established, because that's another argument that the government raises. Before you get there, let me ask you with regard to the, assuming Justice Kennedy's practical functions, he set out some factors that would be taken into consideration as to whether there is a constitutional right or not. Would you apply those factors to this case? Certainly. So the first factor is the citizenship and the status of the plaintiff. Obviously, Sergio was not a U.S. citizen, but in terms of his status, and the status that's important here is, is this person an enemy combatant or not? Is this person an enemy of the United States? And unlike the plaintiffs in Bermuda Inn to whom the constitutional protections were extended, it's conceded that Sergio was not any kind of an enemy of the United States, had not been claimed to be. Also was not a combatant of any type. This was not a war zone. The U.S. was not exercising its military powers. And the other thing I think that's important, and Professor Newman makes this point, is that under this rubric of the factors, also is important, is this a fundamental right or not? That is a normative evaluation of the importance of the right at issue. And take, for example, the plaintiffs in Bermuda Inn. They were challenging their detention. Yes, it's bad to be detained for six years, as those plaintiffs were. In our case, it's the deprivation of a person's right, the most fundamental right. So those are the factors that play into the first Bermuda Inn factor, the status. It's a fundamental human right, the most fundamental human right, and Sergio was not any kind of an enemy of the United States. I read Professor Newman's article, although he certainly plotted the results in Bermuda Inn. He was very reluctant to suggest that his three-part test was going to apply generally to the Constitution. And at the end of his article, for several pages, he goes on speculating about whether Bermuda Inn might apply. And he says this three-part test is going to have to adapt with every provision of the Constitution. He does leave open the question of what the courts are going to do in terms of applying Bermuda Inn in other circumstances. And fundamentally, yes, you're right. But now is the time, I guess, and the opportunity for this court to do exactly what he said was going to have to be done. And I understand that invitation, but what other courts have so broadly interpreted Bermuda Inn? The D.C. Circuit and Al Balul, for example. Al Balul was the – that was – well, not the grand jury indictment. What was that right there? Ex post facto clause. And isn't it correct that the government conceded the issue? The government conceded the issue, and I think seven of the nine or five of the seven, I forget what it was. Yes. Kavanaugh in his concurrence says that seven of nine of us agree with that. That's right. But since the government conceded that, it's not exactly a holding of the court. Well, I think when you read the individual decisions of the seven, they all reached that decision independently. Some of them relying more than others on the concession, but I'll take that concession every day of the week. It's the same government sitting right here. So the second Bermuda Inn factor is the nature of the site. And again, we're in – our plaintiffs are in a better position than the plaintiffs in Bermuda Inn because in Bermuda Inn there was only de facto sovereignty over Guantanamo Bay. Here, every single aspect of the challenge conduct occurred on U.S. soil where there's de jure as well as de facto control. Could Mexico claim that it has de facto control over a certain portion of the U.S. border? Certainly for purposes of applying their law and disciplining, regulating their employees. Certainly you would think if they fired into the United States, they would be – their agents would be subject to review in their courts. My understanding is that their military cross our border periodically. That may be the case. And you would think and would certainly hope and expect that if they did that and caused injury to a U.S. citizen, that a U.S. citizen could obtain redress of that injury in the Mexican courts. Isn't that a matter of foreign relations more than a matter of whether there should be judicial review of actions that occur on the border? I don't believe so, Your Honor. This is a traditional judicial function, certainly in the traditions of this country. It is fundamental to the application of both the Fourth and the Fifth Amendments. That's a fundamental core role of the judiciary is to apply those amendments as a check on the asserted power of the executive. We've been doing that for 200 years. And this sort of unique circumstance that the conduct occurs in the U.S. soil but the injury happens to occur in Mexico should not oust the courts of their traditional function and create a lacuna in the law, especially when we're talking about a fundamental right to human life. It simply cannot be. And you have the tools to reach a just result and a practical, common sense result. So the nature of the site here also argues in favor of these plaintiffs. And then the third factor, Your Honor, is whether or not there are any practical difficulties in the assertion of judicial review. And there are none here. And what Bemidjian had in mind was would assertion of U.S. judicial power cause friction with the other government? Here, exactly the opposite is the case. That is, the government of Mexico has filed amicus briefs in this case saying they affirmatively want the U.S. judiciary to review this case. And they expect that to happen as part of just good relations and what they say are U.S. obligations under international law. Whether or not it's an obligation under U.S. law, it's certainly, I think, our obligation as a society to say when we hire border patrol agents to police our border, we are going to extend to people just across the border the same right to judicial review that would have occurred if this teenager had been shot and killed on U.S. soil or if he had turned out to be a U.S. citizen. It seems little enough for these parents to ask for their son. Actually, Mexico draws a pretty wide swath in their amicus brief and they say when we use force, the United States also has an interest in preventing its own territory from being used to launch assaults on nationals of friendly foreign nations, particularly if those attacks are carried out by a federal officer of the United States in the course of his duties. So you said there you draw your line about the hazy border, and Boumediene said we have total de facto control over Gitmo, which we do. We have a lease. The D.C. Circuit refused to apply Boumediene in Afghanistan, did it not? It did. And what do you say in terms of what Mexico says here about using drone strikes on friendly foreign nations such as ISIS in Iraq? I would say that that's too broad. My own view is we – So Mexico is too broad. It's too broad. We live in a dangerous world. There may be good reasons to deny access to U.S. courts to a jihadist who's injured or killed by U.S. forces in Afghanistan. The jihadist wife, the jihadist kiddos, as we know, they have been collateral damage in many of these attacks. So let's use them. There may be good reasons to deny judicial review in U.S. courts to them of damage in a drone strike, but we should not let those concerns cloud our judgment and distort our law, especially our law as reflected in our value of the rule of law and the respect for human life. We should have confidence in our own institutions, our own judicial system, that we are able to draw distinctions between military use of force and civilian use of force, civilian law enforcement agencies, that we can draw distinctions between Afghanistan and 20 yards over the border in Mexico, that we can draw distinctions between a jihadist or other people injured in attacks on jihadists and a 15-year-old Mexican boy. We have the tools to make these— How would you articulate that limitation? Certainly. As a principle of law, how would you articulate that? It's simply, Your Honor, an application in a specific case of the factors of bemidiyin. In other words, we would decide this case applies to this case and to no other case. It would be an—more or less, Your Honor. That is, draw your decision in this case narrowly, that we are applying bemidiyin in these particular circumstances, and the next case, when somebody else comes into court and claims a right to judicial review in some far-flung foreign nation in a military context, you'll deal with that case when you get to it. But I think everyone would know from bemidiyin, the application of bemidiyin to the individual facts in this case, that you're not establishing some rule of law certainly as broad as what Judge Jones is waiting for. Counsel, you didn't get to qualified immunity. And I have a question about qualified immunity. Assuming, arguendo, that we agree with you or that perhaps we agree with you that it was not raised by the other side, does that preclude us from considering it? I believe that it does, Your Honor. What authority do you have for that? Just the ordinary authority. Just the ordinary rules on that? Ordinary rules that you don't consider things that were not raised below. There's a two-part test for immunity. They raised only Part 1. And they try to say, well, we used the words qualified immunity, so that drags in Part 2. But the Supreme Court has said that there's a difference between arguments and claims. Is this an argument or a claim? I don't know the answer to that. All right. Other questions? All right. Thank you, Counsel. You have exhausted your initial time. You've reserved five minutes for rebuttal. Thank you. We'll hear from the government. Mr. Whitaker. May it please the Court. Henry Whitaker on behalf of the United States and on behalf of Defendants Cordero and Monjarez. In their en banc brief, the plaintiffs reveal that they are no longer pursuing any claims against my clients, Cordero and Monjarez. So regardless of how the Court resolves the remaining issues presented by this case, it should at a minimum affirm the District Court's judgment dismissing the claims against those defendants. With that out of the way, I'd like to devote the remainder of my time to the Bivens claim. Your Honors, this case involves a terrible, terrible tragedy. But the question in this case is not whether the conduct alleged is unlawful or wrongful in the abstract. The question is whether there is any basis for a damages action arising directly under the Constitution against individual federal officers. And the answer to that question is no for any of three independent reasons. First. I'm confused. How is this your argument? Because your individual defendants, I thought you just said, are out. Perhaps I'm missing something obvious. Please help me. Well, we're not out yet, Your Honor. The case is still on appeal. But we, the United States, did address the substantive constitutional issues as to – But I thought that was in some sort of amici capacity or something. Because you aren't really representing him, are you? No, we're a party to this case, and we believe we're properly treated as a party. In some sense, I guess we are an amicus as to that issue. But, of course, the United States does have a tremendous issue in the Bivens issue decided by the panel, even as to Agent Mesa. So are you speaking in some type of amici capacity now, or are you representing the defendant for whom the Bivens action is relevant? I'm not representing – I do not represent Agent Mesa, Your Honor. But, yes, I am addressing substantively the constitutional claims as to Agent Mesa on behalf of the United States. And we are a party to this case. So there are still claims pending against the United States, and I'd be happy to address those if the court wants to hear about them. But I think it's fair to say that the action in this case is now on the Bivens claim against Agent Mesa. And with respect, I'd like to turn to that issue. Well, no, I'd appreciate hearing your response to the U.S. government's liability. You filed the 28J letter in the panel level on the Castro decision. Yes. So your position is that the alien – I'm looking at the 11th claim. Your position is an alien tort statute claim to be valid has to have an express waiver, and you do look at the FTCA for that waiver? That's the position you took before the panel, right? No, I don't think we did, Your Honor. I don't think that – the Westfall Act does not preclude the ATS claim against the United States because the Westfall Act would preclude claims. But by virtue of the Westfall Act, you directed us to then find waiver if it exists only under the FTCA. Oh, yes, Your Honor. That's correct. The alien tort statute, as every court of appeals that has addressed the question, does not waive the sovereign immunity of the United States. The alien tort statute on its face makes no mention of liability against the United States. And moreover, as the Supreme Court made clear in the Kioball case, the alien tort statute itself does not create a cause of action against anyone. Still less could it create a cause of action against the United States specifically, which would require some kind of clear and express language, which the statute – Then you remember the site reference you gave us to Castro. Yeah, I do, Your Honor, and I believe that was on – that was with regard to the FTCA. Well, no. The response, it seems like, why wouldn't the law enforcement proviso itself be the waiver of sovereign immunity in a case like this? Well, the law enforcement proviso would only be relevant if the FTCA itself initially provided a waiver. That is, if it were a claim asserted under 1346B against the United States. The ATS claim against the United States is not such a claim. Well, I don't want to take more of your time now, but in your brief into the panel, your position in response to the ATS claim was, pursuant to the Westfall Act, this claim must proceed now under the FTCA. Well – Their response then was, citing our Sutton decision, that there's an interplay among the various exceptions, and the law enforcement proviso would itself kick in. It isn't trumped by the foreign country exception. Your Honor, that particular language, I think, was directed to the extent to which they were asserting an ATS claim against the individual Federal officers, which would be precluded by the Westfall Act. Well, their 11th claim was against the U.S. Government as well as the individual. Right, and then the brief went on in the section that followed to say that there was no waiver under the ATS, no waiver of immunity under the ATS, and that's the reason why they can't proceed under the ATS. I don't think the Westfall Act is relevant to the United States' liability under the ATS. Although, I will say this. The fact that Congress created – there's a foreign country exception that precludes liability under the FTCA only underscores that the ATS, which would not provide a waiver here, which would basically be an end run around the foreign country exception to the FTCA and provide a cause of action where Congress, without any expressed language, where Congress's expressed language actually foreclosed it. Unless Your Honor has any more questions about the claim against the United States, I'd like, as I said before, to turn to the Bivens claims. Your Honor, this is the first case in this Court's history to involve the extraterritorial application of the Constitution. And there is a very – there is a disputed threshold question of constitutional law. But whatever Your Honors thinks – whatever Your Honors think about that threshold question, it's not necessary to resolve in this case because, at a minimum, the law was not clearly established at the time of the events in question that the Constitution protected a foreign national present on foreign soil. And I think that's the – and I take it that the plaintiffs do not dispute that there was unclarity in the law as of that time as to the application of the Constitution to such an individual. The plaintiffs instead appear to want the Court to apply some abstract concept of wrongfulness that is divorced from any claim under the Constitution. And that's not the way – Can we decide the case on the lack of clearly established law if it wasn't presented in your co-defendant's brief? I think you can decide the question on that basis, Your Honor. First of all, I believe my co-defendant's brief did raise that. Where do you believe that is? Your Honor, I don't have the – The underlying brief or to the – either in their underlying appeal or to the district court. Perhaps we can based on the government's – the claim versus issue. I don't think that you can draw – I think, actually, this Court's decision in Martinez-Aguerra discussed this. The same argument was raised in Martinez-Aguerra that the defendants had not raised the application of – had not raised a clearly established issue as distinct from the threshold question whether there was a right. And what the Court said was, well, you really can't separate out those two issues. Because, of course, if there isn't any constitutional right, that perforce means that there is no clearly established constitutional right. So the question is kind of subsumed. The clearly established question, at least, is certainly more or less subsumed in the threshold question of whether there's any right in the first place. So I don't think you can hermetically separate out those issues from one another. Certainly, the fact that there is this tremendous dispute over that threshold question, as the Supreme Court made clear in Wilson v. Lane, is itself enough to establish a lack of clearly established logic. And Judge DeMoss dissented in this case on that threshold question. And the district court, of course, reached a contrary conclusion as to whether this individual possessed any constitutional rights. So there's a debate about that. And the Supreme Court in Al-Kidd said that you can only say that there's clearly established law if there isn't any reasonable debate about any threshold question. And at a minimum, there is a reasonable debate about that. And, again, the question is not whether the conduct was wrongful in the abstract. This is specific to a constitutional standard of conduct. And I understand that, obviously, the tragic facts of this case are terrible. But let's just abstract from the facts of this case for a second and take the Verdugo example. We know from Verdugo that you can have a search that occurs abroad, let's say, by an intelligence official. That search, search of a home abroad, that would not implicate any Fourth Amendment question under the Verdugo case. But if that same search happened in Chicago, there would be a problem. And I think what that illustrates that in this context, when you're talking about the application of constitutional rights, the applicable standard of conduct does indeed vary depending on the citizenship and location of the individual in question. So it's not at all unusual or fortuitous that that fact, the location and citizenship of the individual, might have considerable legal significance. Your Honors, we've, if there are no questions on the clearly established prong of qualified immunity, I'd like to turn to the threshold question of whether there is any constitutional right in the first place. The controlling precedent that applies to that question in this case, applies to that question in this case, is the Supreme Court's decision in Verdugo, which involved the application of the Fourth Amendment. The Supreme Court in Verdugo considered, in the Supreme Court's words in Boumediene, a variety of objective factors and practical concerns in determining the application of the Fourth Amendment to individuals located abroad. In that case, it was actually property searched abroad, but the same principle would apply to individuals. The first, and what the Supreme Court indicated in Verdugo, is that that question turns on a variety of factors, including the individual's connections to the United States, the individual's citizenship, and the individual's location, and practical concerns with applying the Fourth Amendment abroad. And so, this notion that the Supreme Court's reasoning in Verdugo is somehow inconsistent with the Supreme Court's generalized analysis in Boumediene of prior cases interpreting the application of the Constitution abroad, is just not right, because Verdugo certainly did consider practical considerations. It just relied on a different set of practical considerations than the plaintiffs think is relevant. And this is what Verdugo had to say of a claim that the Fourth Amendment applied abroad. The result of accepting his claim would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries. Application of the Fourth Amendment abroad could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interests. And the plaintiff basically, and the plaintiff more or less, the plaintiff's counsel more or less said in his opening, that he wants you to apply basically an exception to that rule, a ticket for this case and this case only. And that kind of case-by-case determination about whether the Fourth Amendment applies, the Fourth and Fifth Amendments, because Verdugo also discussed the Fifth Amendment, was specifically rejected by the Supreme Court in Verdugo, when it said that the very act of applying a case-by-case contextual analysis would result in, would result in practical difficulties. And Verdugo was a law enforcement case, and nonetheless, the Supreme Court did not hermetically seal the law enforcement example from any other possible instance of applying the Constitution abroad. Instead, it quite correctly recognized that the implication of that holding would have significant consequences for not only the law enforcement context, but also for when the United States military takes actions abroad in the national interest. And I think that those kind of consequences are something that the Court should be mindful of, particularly as it relates to the plaintiff's, I guess, threshold argument, that this case doesn't raise any, quote, extraterritoriality concerns because the conduct occurred, quote, wholly within the United States. And again, I take it that the Supreme Court's precedence on application of the Constitution abroad really, there's no analysis of whether the conduct is, quote, extraterritorial. It's just an analysis of whether the individual in question possesses constitutional rights. And it's very clear under the Supreme Court's precedence, Verdugo among others, that that question turns, among other things, on the citizenship and location of the individual. And I think Judge Jones alluded to this consequence. If it really were the case that the fact that all the physical conduct at issue occurred in the United States, that were sufficient to extend the reaches of the Fourth and Fifth Amendments everywhere in the world, that would have significant consequences for, and it happens every day, for when United States officials within the United States take action to protect our national interests that may have effects abroad. That would be tremendously disruptive, and it cannot be right. And I would just like to say, just as a factual matter, it's very hard for me to see how it's really true, as a factual matter, that the, quote, conduct occurred wholly within the United States. Because, of course, an important element of the conduct at issue here, and indeed the critical and necessary element giving rise to this entire controversy, was the act of the bullet striking the decedent in Mexico. And I don't think you can hermetically separate an instrumentality that an individual employs, let's say a stick, from the physical action that sets that instrumentality in motion. Do we have any other case with similar set of circumstances where the initial action started within the United States and caused injury in another country? I mean, this seems to be a unique situation that the courts have not confronted before. It's actually not unique, Your Honor. We cite, the other side, I don't think cites a single case that supports their notion, but we cite a number of cases, and I point the court to the Ali case in the D.C. Circuit, which involved a claim by certain Guantanamo detainees, a challenge to policymaking that various United States officials conducted while in the United States. And that policymaking conduct occurred in the United States and had effects at Gitmo. And yet, the D.C. Circuit didn't just sort of... Did you see a difference between policymaking and shooting a gun? Analytically, Your Honor, actually I don't, with regard to the argument at least, that all of the challenged conduct occurred abroad, because if all that's being challenged is the policymaking, then I guess they could make the same argument that that conduct occurs wholly in the United States. And as the Supreme Court indicated in Sosa, that kind of conception would basically swallow the rule, because, and this is nearly a quote from Sosa, the Supreme Court said virtually any claim of injury in a foreign country can be repackaged as a failure to train, failure to supervise, or a challenge to unconstitutional policymaking conduct that occurred within the United States. Indeed, in Verdugo itself, I suppose that if the plaintiff's argument here were accepted, the case could have been repleted as a challenge to the policymaking that led to the search, which was planned from a DEA office in California. And clearly, that's not what the Supreme Court had in mind in Verdugo. Another case I'd point Your Honor to is the Morrison case from the Supreme Court in 2010, which involved, which was a statutory case admittedly, but has some similarities here, because, and that case involved the extraterritorial application, well, asserted extraterritorial application of Section 10B of the Securities and Exchange Act. And the same argument was made there, because the fraudulent conduct in that case occurred in Florida, but the transaction occurred abroad. And the plaintiff there made the same argument, said, look, conduct occurred in Florida, no big deal, no issue of extraterritorial application. And the Supreme Court said, no, no, no, yes, the conduct occurred in Florida, but the question of extraterritorial application depends on the focus of the statutory provision at issue. So to here, if you look at the focus of the underlying constitutional provisions, they are focused on the individuals. Does your argument offering us any limiting principle? So let's assume it isn't a situation where it's U.S. government officials defending national security, but instead it's the opposite. It's a U.S. government official in foreign territory doing this super narrow Scalia-Yuskogin's torture case. What argument are you offering to us that there's either statutory or constitutionally relief in U.S. courts? Any? Or is it a null set? Well, I don't, in that particular instance that the conduct occurred wholly abroad, actually there would be, and I'm not sure whether Your Honor is referring to a constitutional or alien tort statute. My preference is to stay with the statute, but I'm just wondering, you started out conceding the tragic facts, and it looks to me when I look through the code, Congress has given the executive branch settlement authority for DEA torts arising in other countries. 21 U.S.C. 904, are you familiar with that? Actually, I'm not familiar with that statute, Your Honor. But I'm not aware of order patrol where activities create torts arising in another country. There is no relief, according to the government's position, other than extradition. Well, I mean, I think Your Honor alluded to, on the facts of this case at least, a number of possible sources of review. And just to underscore, I mean, we did investigate this instance as a potential homicide prosecution, and we concluded as a factual matter that a homicide prosecution was not warranted there. In that instance, Your Honor, I mean, I think the primary checks would be essentially, as the Supreme Court indicated in Verdugo, diplomatic in nature. And there are certain instances in which foreign countries approve ex gratia payments to one another for certain kinds of conduct. I'm not aware that such a request has been made here. But, I mean, I guess- What we have here is not certified he was acting within scope of employment. I'm sorry? Had there been no government certification. Right. Would it have altered the terrain? It would, Your Honor, because in that instance, there might be the possibility of, as Your Honor indicated, a state law tort action if it wasn't indeed. And we didn't allude to that in this case. I didn't want to suggest that this wasn't within the scope of employment. Of course, that is our position. But, yes, in that instance, there would be. But I think that the checks that are at work here, and in the situation Your Honor posited, are the same kind of checks that were at work in Eisentrager and Verdugo. I mean, one of the points that Boumediene made was that the United States, at Landsberg Prison in Germany, was answerable to its allies for conduct that occurred there because other countries had control. And something similar is happening here. And as Your Honor noted, we did decline extradition in this case, and we have to face the diplomatic consequences for that. And this is what the Supreme Court in Verdugo had to say about those consequences. Quote, if there are to be restrictions on searches and seizures which occur incident to such American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation. There are checks at work here, Your Honors. The checks are imposed by the political branches in the first instance. Mr. Whitaker, if we agree on the clearly established position that you have, which, of course, remains to be seen, is it important from the Justice Department viewpoint that we do go through the normal chronology and establish first if there's a constitutional right? Should there be a pronouncement from this Court? Your Honor, actually, I think that the better course would be not to reach that threshold question and instead simply to hold the conduct is clearly established. And, of course, the Supreme Court used to have this rigid order of battle for qualified immunity cases and has relaxed that in the interest of constitutional avoidance. And that's what I would respectfully suggest the Court should do here. Your Honors, I see my time has expired. I haven't had time to address the judgment bar or the special factors argument. If the Court has any questions about those, I'd be happy to answer that. But unless the Court does, I prefer we'll take the rest of it on your brief. You've exhausted your time. Thank you for responding. We'll hear now from Mr. Ortega. May it please the Court. Randy Ortega on behalf of Agent Mesa. The plaintiffs have sought to bring a claim against my client utilizing both the Fourth and Fifth Amendments as their vehicle, deriving their claim through Bivens. I would present to the Court as a preliminary matter that only the Fourth Amendment would be the proper vehicle for bringing that claim. And when we look to the Fourth Amendment, it's undisputed that the deceased was an alien without presence in the United States or without substantial connection within the territorial United States when he died. Given those facts, he certainly lacked protection under the Fourth or the Fifth Amendments that could overcome my client's qualified immunity. We think the Verdugo case is very clear that an alien, which Mr. Hernandez was in this case, with no voluntary attachment to the United States, has no extraterritorial Fourth Amendment rights. Counsel, it's been suggested that aside from the claims like the ones brought in this case, that there are some other avenues for recourse, for judicial review of this kind of conduct? Well, I think there . . . Well, I think there . . . I apologize, Your Honor, for interrupting. No, go ahead. I think that there is at least one other avenue, and that's Section 2672, the Administrative Adjustments of Claims, where the Attorney General has the right to consider payment for actions occurring in foreign countries. Anything else? In terms of monetary damages or in terms of, in essence, what was raised by the appellants as Mr. Mesa's having to, in essence, answer for his actions, because I think those are two different questions. I'm thinking in terms of some kind of civil claim. In terms of a civil claim, I believe that the only appropriate avenue would be 28, Section 2672. So when we get back to the Fourth Amendment, we see that aliens can only receive constitutional protections when they come within the territory of the United States. It's really their presence within the United States that gives the judiciary the power to act. If they are not in the United States, then we are, in essence, invading the province of a foreign country. The appellants go out of their way to cite the Boumediene case, which I think is extremely different and not in any way analogous to the factual basis of this case. In that case, certainly, as the Court is aware, the United States occupies Guantanamo Bay and exercises complete de facto jurisdiction over Guantanamo Bay. In this case, the United States has no jurisdiction, whether it be 40 yards or 4,000 miles into Mexico. There is no—the dividing line there is the border, and it's a real dividing line. It's not a gray dividing line. It's not only divided by the international boundary, at least. It's also divided by a fence, and it's divided by border protection on the United States, who cannot cross into Mexico. Crossing into Mexico with a weapon would subject them to a minimum five-year penalty under Mexican law. Do you agree with the United States that we should just decide the case based upon clearly established law? And if so, is your briefing any hindrance to our doing so? I don't believe our brief is a hindrance to you doing it, no, Your Honor. Do you agree with the United States that we should decide the case on that basis? Well, I think that this Court should decide the case, at least as it revolves around Agent Mesa, to the brief that we provided to the Court. Getting back to the Fourth Amendment, the plaintiffs and the appellants in this case have conceded that Mr. Hernandez was an alien to the United States, and he never stepped foot into the United States, and he was in the sovereign territory of the Republic of Mexico. I think that speaks volumes, because they are, in themselves, conceding that they were in the sovereign territory of the Republic of Mexico and was in no way connected to the United States. Because the Fourth Amendment is the proper vehicle to get to their claim, because the death of Mr. Hernandez was, in essence, a seizure, Mr. Ortega, is the Fifth Amendment claim available? You seem to think it is not. Why would it not be available? Well, Your Honor, I don't believe it is. I mean, to get to the Fifth Amendment claim, I think you have to use Boumediene to extend, if you will, the protections of the Fifth Amendment, and I think the Supreme Court was very, very clear in that case, and they narrowed it to the suspension clause. I don't think that they left that open to interpretation. I think they decided that case very narrowly, as it applies to the suspension clause under those specific facts. But the process that Justice Kennedy used in making his decision, does that give us some guidance as to how we should evaluate these cases? He didn't seem to restrict himself to only habeas cases in making his evaluation. The three-factor test, Your Honor? Yes. And given us the history of constitutional extraterritorial, he did not restrict himself only to habeas corpus cases. So you're saying that this is only restricted to the suspension clause, but Justice Kennedy's evaluation did not restrict himself to only suspension clause cases. Well, I think that certainly, Your Honor, I would disagree that the Supreme Court, they explicitly confined it only to the extraterritorial reach of the suspension clause. After applying the three-part test, the citizen and status, the nature of the sites, and the practical obstacles, after applying that test. And certainly if you apply that test here, Mr. Hernandez was a citizen of Mexico. The death occurred in Mexico. And I think that there are practical obstacles. I think it would involve creating an invasion of the sovereign Republic of Mexico by U.S. law. Certainly the Mexican government in their amicus brief has to their control. I wasn't sure where you were going about an invasion of Mexico. Never mind. Well, Your Honor, I think that the plaintiffs in this case certainly want the court to abandon the precedent that was set in Verdugo. I think that they want the court to ignore clearly established precedent by extending the application of the Bumerine case. And I'm sorry. Should I keep going? Finish your sentence. I mean, you can complete the thought, but not determine a new thought. Well, Your Honor, I think that the court should reject the plaintiff's invitation to ignore clearly established law in Verdugo, and I don't believe that the court should expand the extraterritorial reach of the United States using Bumerine as its vehicle under the Fourth or Fifth Amendment. And I believe that only the Fourth Amendment is the proper vehicle to bring the claims. All right. Thank you, sir. All right. Counsel, Mr. Hernandez, you back up. You've got five minutes rebuttal. Thank you, Your Honor. Unless there are questions on other issues, I'd like to address the question of the relationship between the clearly established and whether or not there is a constitutional right in the first instance. It seems to be that's where there's a bit of interest. We just heard Mr. Ortega admit that the court should decide the case based upon the issues raised in his brief. He did not raise in his brief in any substantial way or in any way at all whether or not the right was clearly established. So therefore, we have a concession by counsel for Mr. Mesa that the court should decide this question not on whether or not the right was clearly established, but whether or not there is, in fact, the extraterritorial effect of the Constitution on the facts of this case. I think he did raise it in his en banc brief. The question is whether he raised it in the district court in the initial brief to the panel, and clearly he didn't, apparently. So where does that leave us? I think that leaves you in the situation of deciding this case based upon only the one branch of the qualified immunity inquiry, which is whether or not the Constitution extends in these facts. But he's the appellee. You're the appellant. You said there is clearly established law that the Fifth Amendment applies per vermillion. Doesn't he have the right to respond to those points? We raised that in response to the arguments of the government in whatever capacity they are. What I'm saying is your client was the appellant from the district court. They don't have to file a cross appeal in order to make their points in response to you, and your burden was to show, A, there's a right, and, B, it is clearly established. From our opening brief in this court, Your Honor, we have said that they did not raise that issue in the district court. The question is . . . We made that argument. It's not a game of gotcha. We've taken this case in bank. This isn't gotcha. It doesn't matter what it is. You're raising serious constitutional issues. I don't think we're going to be tracing back through the briefs to figure out who raised and who didn't. We're here in bank. You're asserting that there's clearly established law. Let me address that. From my eyes, your burden here is to convince us of what it is rather than us having . . . We can look through the briefs and figure it out, but we're here in bank. You've got two minutes and a half to further convince us of that. Okay. Let me convince you in the time that I have left with respect to clearly established law. Pearson and other Supreme Court cases makes absolutely clear that the purpose of qualified immunity is to protect officers who, quote, reasonably believe that their conduct complied with the law. Now, the original panel decision quite correctly pointed out that no agent under any circumstances would have somehow got it in his head that it was okay to shoot an unarmed, unthreatening teenager or anyone else under any circumstances. In other words, for it to matter whether or not . . . On that point, though, it still remains the question of whether it's established law, is it not? Irrespective of whether it serves that particular purpose or are you saying because it does not serve that purpose, then qualified immunity itself does not apply? I'm saying . . . I'm invoking . . . I mean, clearly established law is not required. Right. A little bit of both, in that there's a line of cases that the panel quite properly invoked that says when it is obviously wrong, then you do not need . . . an officer does not need a particular case on those particular facts. And as applied here, what that meant was no reasonable agent would think, okay, I can't use excessive force, excessive fatal force against a U.S. citizen on U.S. soil, but maybe that doesn't apply to me when I'm shooting a teenager just across the border. Well, all this comes down to a matter of article pleading, does it not? It does not, Your Honor. Well, because let me just suggest, I mean, I know we're bound by the allegations of the plaintiff's complaint, but the Justice Department press release issued in 2012 based on an investigation conducted in 2010 says that the agent had a detainee and rocks were being thrown by smugglers at the detainee and twenty-five witnesses were interviewed, among other things. So I'm just suggesting to you that the problem about clearly established law here is that anybody can get into court on the pleadings that your client has asserted, right? I mean, it happens all the time in domestic law enforcement and then you have to say, well, this is what the Border Patrol policy is and I'm going to take up your time, I realize, but this shows why this invades the province of law enforcement at the border in a very fearless way. With respect, Your Honor, number one, that press release is not in the record and is not correct. I've seen the three videotapes of this incident and I have been debriefed by the criminal justice department lawyers who did that investigation who told me, with Sergio's parents there, that Sergio did not throw any rock. So let's start with there, whether or not someone else threw a rock. All right, I'm going to cut you off and we will assume that you disagree with the press release and its recitation. Okay. I will let you make a concluding remark of a declarative sentence and then your time is up. Okay, thank you, Your Honor. What was clearly established were the standard that governed the agent's conduct. Every agent and every law enforcement agency with a gun in its holster knows you cannot shoot unarmed, unthreatening persons, persons who are not threatening your life or serious bodily injury or to someone else. Everyone knows that, and that does not change based upon the color, the nativity, or the location of the person. This is a right to human life and every person has it. No circumstance changes the standard of conduct that governs a law enforcement agent's use of fatal force. Thank you, Your Honor. Thank you, sir. I believe we have your argument. Thank you to counsel for your briefing and argument. The court will take the case under advisement. With that, we stand adjourned.